IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS

| | | |
|---|---|---|
| **Vitol International Shipping Pte Ltd.** § | § | CASE NO. 4:25-CV-_____ |
| **Plaintiff,** § | § | |
| § | § | IN ADMIRALTY |
| v. § | § | |
| § | § | |
| **LPG TINOS I, her engines, freights** § | § | **PLAINTIFF VITOL** |
| **apparel, appurtenances, tackle, etc.,** *in rem*, § | § | **INTERNATIONAL SHIPPING** |
| **and Tinos Maritime & Trading SA and** § | § | **PTE LTD.'S VERIFIED** |
| **Pearl Petrochemical FZE,** *in personam*, § | § | **COMPLAINT** |
| § | § | |
| **Defendants.** § | § | |

COMES NOW, Plaintiff Vitol International Shipping Pte Ltd. (hereinafter "Plaintiff" or "Vitol Int'l"), by and through undersigned counsel, and files this Verified Complaint against Defendants LPG TINOS I, her engines, freights, apparel, appurtenances, tackle, etc. *in rem*, (hereinafter "the Vessel"), and Tinos Maritime & Trading SA,. (hereinafter "Tinos Maritime") and Pearl Petrochemical FZE (hereinafter "Pearl"), *in personam*, (hereinafter collectively "Defendants"). Plaintiff alleges and pleads as follows:

## JURISDICTION AND VENUE

1. Subject matter jurisdiction of this Honorable Court is based upon admiralty and maritime jurisdiction pursuant to 28 U.S.C. § 1333 and is brought under the provisions of Rule B and Rule C of the Supplemental Rules for Admiralty and Maritime Claims and Asset Forfeiture Actions (hereinafter "Supplemental Rules").

2. This case is an admiralty and maritime claim within the meaning of Rule 9(h) of the Federal Rules of Civil Procedure in that it involves a claim for breach of charter party, a maritime contract, and unpaid amounts due for necessaries.

1

3. Venue is proper in the United States District Court for the Southern District of Texas, Houston Division pursuant to 33 U.S.C. § 1391(b)(2), as the LPG TINOS I is located within in the judicial district and anchored at Bolivar Roads Anchorage.

## THE PARTIES

4. At all times material hereto, Plaintiff Vitol Int'l was and still is a foreign business.

5. At all times material hereto, Defendant LPG TINOS I is a Panamanian-flagged 18,906-gross tonnage, liquid petroleum carrier, built in 2024, with IMO No. 9969821, and is now within the Southern District of Texas, and is subject to the jurisdiction and venue of this Honorable Court. Defendant LPG TINOS I is on the U.S. Treasury Department's Office of Foreign Asset Control's Specially Designated Nationals List pursuant to Executive Order 13902.

6. At all times material hereto, Defendant Tinos Maritime was and is a foreign business with a registered office in the Republic of Panama and as of March 11, 2025, is the registered Owner of the LPG TINOS I.

7. At all times material hereto, Defendant Pearl was and is a business entity organized in the United Arab Emirates, and upon information and belief, the ultimate beneficial owner and/or common business entity of Tinos Maritime. Defendant Pearl is on the U.S. Treasury Department's Office of Foreign Asset Control's Specially Designated Nationals List pursuant to Executive Order 13902 NSPM-2.

## SUBSTANTIVE FACTS

**A. The Ownership of the LPG TINOS I**

8. Upon information and belief, Tinos Maritime and/or Pearl entered into a Memorandum of Agreement to purchase the LPG TINOS I from a Chinese shipbuilder, China State Shipbuilding Corporation (CSSC), to be delivered in the first quarter of 2024.

9. Upon information and belief, CSSC (Hong Kong) Shipping Company Limited ("CSSC HK") operates as a ship leasing company and/or intermediary between CSSC and vessel owners. On or about October 30, 2023, CSSC HK, by and through its subsidiary Fortune Pandas I Shipping PTE Ltd entered into a sale and leaseback agreement of the TINOS I with Defendant Tinos Maritime.

10. Pursuant to the agreement Fortune Pandas I Shipping Pte Ltd. would obtain 'registered ownership' of the Vessel and Tinos Maritime would serve as the Disponent Owner exercising complete operational control over the Vessel pursuant to a Bareboat Charter Agreement.

11. Although the original term of the Bareboat Charter Agreement between Fortune Pandas I Shipping Pte Ltd. and Tinos Maritime was anticipated to last for an 120-month term, Fortune Pandas I Shipping Pte Ltd. cancelled the Bareboat Charter Agreement on or about October 23, 2024.

12. As set forth in greater detail below, the cancellation of the Bareboat Charter Agreement was, upon information and belief, related to U.S. authorities' concerns (that only arose after Plaintiff Vitol Int'l entered into a charter party with Defendant Tinos Maritime, as detailed below) that Defendants' were beneficially owned by sanctioned nationals, *i.e.* Mr. Seyed Asadollah Emamjome and/or his son, Mr. Meisam Emamjome.

13. On or about March 11, 2025, Fortune Pandas I Shipping Pte Ltd. entered into a contract for the resale of the Vessel back to Tinos Maritime. On or about March 17, 2025, the Republic of Panama issued a Certificate of Registry for the Vessel confirming that Defendant Tinos Maritime is the registered owner of the Vessel.

B. **The Time Charter and Maiden Voyage**

14. On or about April 26, 2024, Plaintiff Vitol Int'l entered into a time charter party agreement, as reflected in the accompanying "Fixture Note," with Tinos Maritime to charter the Vessel, following its delivery from the CSSC shipyard. **Exhibit 1**. The time charter party was for a period of twelve (12) months.

15. Except as amended by the terms explicitly set out in the Fixture Note, the form SHELLTIME 4 charter party governed the parties' time charter party agreement. **Exhibit 2**.

16. The time charter party agreement is a maritime contract.

17. The Fixture Note included inter alia a BIMCO Sanctions Clause for Time Charter Parties 2020. This clause included, *inter alia*, the following warranty:

> (b) Owners warrant that at the date of this Charter Party and throughout its duration they, the registered owners, bareboat charterers, intermediate disponent owners, managers, the Vessel and any substitute are not a Sanctioned Party.

*Id*., at **Exhibit 1**.

18. Paragraph (d) of the BIMCO Sanctions Clause further stated that "If at any time either party is in breach of subclause (b) or (c) above then the party not in breach may terminate and/or claim damages resulting from the breach."

19. The Fixture Note also includes a dispute resolution clause which provided that any dispute was to be referred to arbitration in London with English law to apply. *See* **Exhibit 1**.

20. The applicable SHELLTIME 4 charter party additionally includes the following statement contained in Clause 26 establishing the right to a lien: "Charterers shall have a lien on the vessel for all monies paid in advance and not earned, and for all claims for damages arising from any breach by Owners of this charter." *Id*.

21. At 16:30 hours UTC on May 21, 2024, Vitol Int'l took delivery of the Vessel in Singapore. Vitol Int'l then ordered the Vessel to Houston, Texas to load its first cargo.

22. The Vessel arrived in Houston, Texas on or about June 24, 2024, at the outer anchorage to await berthing instructions. The Vessel was scheduled to call at Houston to load a cargo of Liquid Petroleum Gas for delivery to China. However, upon arrival, the Vessel was not permitted to enter the port of Houston for cargo operations.

C. **OFAC Sanctions Restrict the Vessel**

23. At the commencement of the charterparty, Plaintiff did not have reason nor cause to belief that the Defendant Tinos Maritime was subject to any sanctions. However, on June 28, 2024, the Plaintiff was approached by U.S. Authorities indicating that the Defendant Tinos Maritime was beneficially owned by Mr. Seyed Asadollah Emamjome and/or his son, Mr. Meisam Emamjome, who may be Iranian nationals and were under investigation.

24. Both individuals have since been sanctioned by the United States in their individual capacity since at least April 22, 2025, as well as through their beneficial ownership of Defendant Pearl, who is also subject to U.S. sanctions.

25. The allegations by the U.S. Authorities would prevent and prohibit U.S. persons from engaging in activities involving the Vessel (or her Owners).

26. Consistent with the risk of sanctions, the Vessel lost its berthing position at the local terminal within the Port of Houston.

27. On or about June 29, 2024, Plaintiff declared the vessel off-hire pursuant to Clause 21 of the time charter party agreement and maintained that Tinos Maritime's inability to trade the Vessel in the United States was a breach of the charter party agreement. Indeed, contrary to Clause 13(a) of the Charter Party, the Plaintiff was not able to employ the Vessel. Further, Defendant Tinos Maritime was in breach of their obligations to "prosecute all voyages with the utmost dispatch" (Clause 2(b)(i)). *See* **Exhibits 1-2**.

28. The Charter Party's off-hire clause included a provision addressing loss of time due to detention of the vessel by authorities at home or abroad attributable to legal action against or breach of regulations by the vessel, the vessel's owners, or Owners. *Id.*, at Clause 21.

29. The off-hire clause further provides:

IF FOR ANY REASON WHATSOEVER THE VESSEL WILL BE OFF HIRE OR IS REASONABLY ESTIMATED TO BE OFF HIRE FOR 30 CONSECUTIVE DAYS OR MORE, CHARTERERS MAY HAVE THE OPTION TO CANCEL THE BALANCE OF THE CHARTER PARTY, WHICH MUST BE DECLARED BY CHARTERERS LATEST 10 DAYS AFTER THE VESSEL IS OFF HIRE FOR 30 CONSECUTIVE DAYS OR LATEST 10 DAYS FROM THE MOMENT IT BECOMES CLEAR THAT THE VESSEL IS ESTIMATED TO BE OFF HIRE FOR 30 CONSECUTIVE DAYS OR MORE. IN CASE THIS OPTION IS NOT DECLARED BY CHARTERERS THE CHARTER

*Id.*

30. Despite the notice of June 29, 2024, Defendants failed, neglected, and/or refused to resolve the issue with U.S. authorities which prevented the Vessel to enter the terminal at Houston and/or carry cargo from a U.S. terminal, all of which was in breach of the charter party agreement.

31. At the time the Vessel was declared off-hire, there had already been prepaid hire by Plaintiff consistent with the terms of the charter party which had not yet been earned by the Vessel.

32. After the events of June 28 - 29, 2024, the Vessel remained off hire, detained, or otherwise unavailable to the Plaintiff.

33. On or about July 16, 2024, OFAC advised Vitol Int'l by email that activities and payments pursuant to the LPG TINOS I times charter "appear to be very high-risk from a U.S. sanctions perspective."

34. On July 23, 2024, OFAC granted a specific license permitting Vitol Int'l to arrange for and pay for the Vessel's bunkers and other provisions, under reservation of rights. Vitol Int'l

6

arranged for the supply of necessaries (*i.e.* bunkers) to the Vessel during the course of the fall of 2024.

35. Upon information and belief, on or about October 23, 2024, Fortune Pandas terminated its bareboat charter agreement with Tinos Maritime. Vitol Int'l was not notified of the termination of the bareboat charter agreement and remained unaware of the termination until March 2025.

36. During this period of time, Vitol Int'l had not yet formally declared the charter party terminated, as U.S. authorities had not yet officially sanctioned Owners and/or the Vessel.

37. Once Vitol Int'l was made aware of the termination of the bareboat charter agreement and given the ongoing sanctions investigation by U.S. authorities, which continued to render the vessel unavailable to the Plaintiff, Vitol Int'l served notice of termination of the April 26, 2024 time charter party on or about March 3, 2025.

38. On March 11, 2025, Fortune Pandas entered into a contract for the early resale of the Vessel back to Tinos Maritime, which was completed on or about March 17, 2025.

39. On April 22, 2025, OFAC designated the suspected owner, Defendant Pearl, and the Vessel (based on Pearl's beneficial ownership of the Vessel) as Specially Designated Nationals under Executive Order 13902 NSPM-2, blocking all property held by Pearl and prohibiting transactions within the U.S. involving the blocked property. *See* **Exhibit 3**.

40. OFAC subsequently issued a General License authorizing certain transactions involving the Vessel while located in the USA, including "the sale of the Tinos I, provided the net proceeds of the sale be placed into a blocked interest-bearing account at a U.S. financial institution." *See* OFAC General License at **Exhibit 4**.

### D. Breach of the Charter Party Agreement

41. The Iranian Transactions and Sanctions Regulations, 31 C.F.R. part 560 ("ITSR"), prohibit transacting or dealing in services of Iranian origin, which includes services performed outside Iran by a citizen, national or permanent resident of Iran who is ordinarily resident in Iran, or by an entity organized under the laws of Iran or any jurisdiction within Iran. 31 C.F.R. §§ 560.206, 560.306. These particular sanctions were based on Executive Order 13059 (Aug. 9, 1997). 77 Fed. Reg. 64664 (Oct. 22, 2012).

42. Based on the above regulations, OFAC Opined in July 2024, that "To the extent this applies to the ultimate beneficial owner of Pearl Petrochemical FZE, Vitol's dealings with Pearl Petrochemical FZE *(e.g.*, any activity, service, carriage, trade or voyage), may be prohibited."

43. On April 22, 2025, OFAC added the Vessel, Defendant Pearl, and Meisam Emamjomeh to its Specially Designated Nationals List under EO 13902. This designation is distinct from status under 31 C.F.R. § 560.206 and E.O. 13059. While OFAC intends to promulgate regulations under E.O. 13902, it has not yet done so. OFAC FAQ 831 (Dec. 7, 2020).

44. The BIMCO Sanctions Clause in the charter party contains a warranty that, "at the date of this Charter Party and throughout its duration they, the registered owners, bareboat charterers, intermediate disponent owners, managers, the Vessel and any substitute are not a Sanctioned Party." *See* Exhibit 1.

45. Subclause (e) of the clause further requires that "Charterers shall not give any orders for the employment of the Vessel which involves a Sanctioned Party or a Sanctioned Activity." Subclause (d) of the Sanctions Clause provides for damages resulting from the breach of the Owner's warranty.

46. The Fixture Note also incorporates the BIMCO Designated Entities Clause, which contains a further owner's warranty that

> [a]t the date of this fixture and throughout the duration of this charter party they are not subject to any of the sanctions, prohibitions, restrictions or designation referred to in sub-clause (a) which prohibit or render unlawful any performance under this charter party or any sublet or any bills of lading. Owners further warrant that the nominated vessel, or any substitute, is not a designated vessel.

Exhibit 1.

47. The Designated Entities Clause further requires the violating party to indemnify the non-breaching party:

> owners or charterers shall be liable to indemnify the other party against any and all claims, losses, damage, costs and fines whatsoever suffered by the other party resulting from any breach of warranty as aforesaid.

*Id.*

48. The Charter Party contained a clause putting the Master "under the orders of Charterer as regards employment of the vessel" (Clause 13(a)) and a guarantee by owners that the Vessel's master and crew would "prosecute all voyages with the utmost dispatch" (Clause 2(b)(i)).

49. The Vessel arrived at Houston Anchorage on June 24, 2024 and did not proceed to berth to load cargo as ordered by Charterers. The Master's failure or inability to proceed to berth and load cargo as ordered by Charterers after arriving at Houston Anchorage on June 24, 2024 is in breach of Owners' guarantee that Master and Crew would prosecute the voyage with utmost dispatch.

50. Owner's non-compliance with U.S. sanctions regulations and the Master's failure or inability to proceed to berth to load cargo resulted in the Vessel being unavailable to Charterers and/or the vessel being in off-hire status. The failure by the Vessel and her Owners to resolve the issues and/or the declaration of off hire within the thirty (30) day time period proscribed by the

9

charter party gave Plaintiff the right to exercise its option to declare the balance of the charter party terminated and canceled.

51. As Defendants were in breach of the charter party, Plaintiff Charterers Vitol Int'l exercised its rights under the contract to cancel same.

### E. Vitol Int'l Overpaid Hire and Bunker Payments

52. On May 29, 2024, Tinos Maritime invoiced Vitol Int'l for hire covering the first thirty (30) days of the time charter, from May 21, 2024 to June 20, 2024, an amount of $1,425,000.00. Consistent with the terms of the charter party, Vitol Int'l also paid for the value of the bunkers onboard the Vessel at the time of delivery, *i.e.*, $507,525.58. Accordingly, Vitol Int'l paid a total amount of $1,932,525.58.

53. On June 17, 2024, Tinos Maritime invoiced Vitol Int'l for hire covering the next thirty (30) days of the time charter in the amount of USD $ 1,425,000,00; which was promptly remitted by Plaintiff for the next thirty (30) day period through July 20, 2024.

54. The prepaid hire remitted by Vitol Int'l was not earned once the Vessel was prohibited from following Vitol Int'l's lawful orders and the Vessel was placed off-hire on June 29, 2024.

55. As such, at least 20-days of prepaid hire which was unearned is due and owing under the charter party agreement to be refunded to Plaintiff. *See* **Exhibits 1-2**.

56. Accordingly, the sum of USD $950,000.00, plus applicable prejudgment interest and costs, remains indisputably due and owing for the overpaid hire, prepaid in advance and not earned.

57. Vitol Int'l also purchased bunkers for the Vessel while it has remained at anchor. The bunker purchases and amounts are located below:

| Invoice Date | Amount |
|---|---|
| August 22, 2024 | $189,661.90 |
| September 4, 2024 | $163,817.10 |
| October 16, 2024 | $177,353.82 |
| December 5, 2024 | $165,558.70 |
| January 27, 2025 | $189,397.63 |
| Total | $885,789.15 |

58. Vitol Int'l paid the bunker supplier for the fuel provided to the Vessel.

59. The said bunkers delivered to the Vessel were necessary to the accomplishment of her mission; to wit: the safekeeping of a commercial ship and her crew.

60. The Vessel has received the benefit of the bunker deliveries provided by Plaintiff and is indebted to Plaintiff, and obligated to pay for the aforementioned necessaries.

61. As a result of the foregoing, Vitol Int'l has a maritime lien on the LPG TINOS I for the provision of necessaries, *i.e.* bunker fuel, enforceable in admiralty in accordance with the provisions of Rule C of the Supplemental Rules for Certain Admiralty and Maritime Claims.

62. Plaintiff has performed all conditions precedent to warrant full and complete payment for the aforementioned services.

63. Notwithstanding, the sum of USD $885,789.15, plus applicable prejudgment interest and costs, remains indisputably due and owing for the bunkers supplied to the Vessel.

**REQUEST FOR RULE B ATTACHMENT AND ISSUANCE OF WRIT OF MARITIME ATTACHMENT AND GARNISHMENT**

64. Plaintiff restates and re-alleges paragraph 1 – 63 in the above foregoing Verified Complaint.

65. Defendant Owners provided an unseaworthy Vessel and is in repudiatory breach of the parties' charter party agreement. *See* **Exhibits 1-2**. Specifically, Defendant Owners breached the warranty contained in the Fixture Note's sanctions and/or designated entity clause, failed to proceed with utmost dispatch, failed to proceed to berth consistent with Charterers instructions, was unavailable to Charterers and was off-hire in excess of thirty (30) days, all of which being in breach of the parties' charter party agreement.

66. As a result of Defendants' breach, Plaintiff is entitled to recovery of overpaid hire and unpaid bunkers in the amount of not less than USD 1,835,789.15.

67. Vitol Int'l's claims against Defendant Owners for breach of the charter party agreement is a maritime claim.

68. This is an ancillary proceeding, brought in order to obtain jurisdiction over Defendant Tinos Maritime to obtain security for Plaintiff's claims in aid of Plaintiff's London arbitration proceedings.

69. Interest, costs, and attorney's fees are routinely awarded to the prevailing party under English Law and the procedural rules of London arbitration. It is standard for interest to be awarded to the prevailing party in the amount of 4.5% to 6%, compounded quarterly.

70. It is common in Rule B attachment cases for the security to be set at one and a half (1.5) times of the fairly stated claim, and therefore Plaintiff also seeks an Order of Attachment of the Vessel in the amount of $2,753,683.72. *See* Supplemental Rule E (5) (permitting substitute

security up to twice the amount of Plaintiff's fairly stated claim to cover interest, costs, and fees, etc.).

71. Defendants Fortune Pandas, Tinos Maritime, and Pearl are not present or cannot be found in the Southern District of Texas within the meaning of Rule B of the Supplemental Admiralty Rules. *See* Local Rule 7.02(a). Furthermore, none of the officers of Defendants are within the District; Defendant Owners do not maintain offices or telephone listings in the District. Defendant Owners are not incorporated or registered to do business in the State of Louisiana; and Defendant Owners do not have a registered agent for the receipt of service of process in the State of Texas. A copy of the Attorney Declaration is attached hereto as **Exhibit 5**.

72. The LPG TINOS I is the property of in personam Defendants, all of whom have an interest in the Vessel, which is located within the District and subject to attachment and garnishment pursuant to Rule B.

**REQUEST FOR RULE C ARREST AND ISSUANCE OF WARRANT OF ARREST**

73. Plaintiff repeats and re-alleges paragraphs 1-63 in the above and foregoing Verified Complaint, and for its further and additional admiralty *in rem* claims against the Defendant Vessel, alleges and pleads as follows:

74. Plaintiff's claim for the aggregate amount of USD 885,789.15, plus interest and costs, attaches as a maritime lien for bunkers supplied to the Vessel in the United States.

75. Accordingly, Plaintiff may and does now seek enforcement of a maritime lien for the supply of necessaries, i.e. bunker fuel, under the provisions of 46 U.S.C. §§ 31341 *et seq*., which is enforceable against the said Vessel with suit *in rem*.

76. As the award of prejudgment interest is standard in admiralty and maritime matters, and costs for the arrest of the Vessel are recoverable under applicable law and the Supplemental

Admiralty Rules, it is common in Rule C arrest cases for the security (for applicable costs, fees, interest, etc.) to be set at one and a half (1.5) times of the fairly stated claim, and therefore Plaintiff seeks an Order of Arrest in the amount of USD 1,328,683.72. *See* Supplemental Rule E(5) (permitting substitute security up to twice the amount of Plaintiff's fairly stated claim to cover interest, costs, and fees, etc.).

77. Accordingly, Plaintiff seeks to enforce its maritime lien, pursuant to Rule C of the Supplemental Rules for Admiralty and Maritime Claims and Asset Forfeiture Actions.

**WHEREFORE PREMISES CONSIDERED**, Plaintiff Vitol Int'l prays as follows:

A. That Process in due form of law, according to the practice of this Honorable Court in matters of admiralty and maritime jurisdiction, be issued against Defendants, and Defendants be cited to appear and answer the allegations of this Verified Complaint;

B. That this Honorable Court enter an order of *in rem* arrest for LPG TINOS I pursuant to Rule C of the Supplemental Rules to enforce Plaintiff's maritime lien and that the Vessel be seized by the U.S. Marshal to be held as security against any judgment to be entered herein;

C. That if Defendant Tinos Maritime cannot be found within the District, then all of their respective property within this District, tangible or intangible, including but not limited to LPG TINOS I, owned by or in the hands or control of persons named as garnishees in the Process of Maritime Attachment and Garnishment be attached and seized pursuant to Rule B of the Supplemental Rules;

D. That judgment be entered in favor of Plaintiff and against the Defendant LPG TINOS I, her engines, freights, apparel, appurtenances, tackle etc. *in rem*, for the amount pled herein as well as for interest, costs, attorney fees, and disbursements for this action;

14

  E. That the Court grant Plaintiff such other and further relief as may be just, equitable, and proper.

                 Respectfully submitted,

Dated: July 24, 2025        CHALOS & CO, P.C.
    Houston, Texas

            By: /s/ George M. Chalos
              George M. Chalos, Esq.
              Attorney-in-Charge
              Texas Bar No. 24077854
              SDTX Federal Id No. 623727
              7210 Tickner Street
              Houston, TX 77055
              PH: (713) 574-9582
              FX: (866) 702-4577

              *Attorneys for Plaintiff*
              *Vitol International Shipping Pte Ltd*